UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Cathy Anne Lonardo
      v.                          Civil No. 10-cv-482-JL
                                  Opinion No. 2011 DNH 192
Michael J. Astrue, Commissioner,
Social Security Administration


**MEMORANDUM ORDER**

    This is an appeal from the partial denial of a claimant's

application for Social Security Disability Benefits.  See 42

U.S.C. § 405(g).  The claimant, Cathy Anne Lonardo, contends that

the administrative law judge ("ALJ") incorrectly found that

although Lonardo suffered from cervical radiculopathy, depression

and anxiety, Admin. R. 11;[1] see 20 C.F.R. §§ 404.1520(a),(c), she

retained the residual functional capacity[2] ("RFC") to perform

unskilled sedentary work, Admin. R. 12; see 20 C.F.R.

§§ 404.1567(a), 404.1568(a).  The ALJ concluded that although she

was unable to perform her prior work as a "house cleaner," given

her age, education and work experience, there were a significant

---

    [1]The court will reference the administrative record ("Admin.
R.") to the extent that it recites facts contained in or directly
quotes documents from the record.  Cf. Lalime v. Astrue, No. 08-
cv-196-PB, 2009 WL 995575, at *1 (D.N.H. Apr. 14, 2009).

    [2]"Residual Functional Capacity" is defined as "an assessment
of an individual's ability to do sustained work-related physical
and mental activities in a work setting on a regular and
continuing basis.  A 'regular and continuing basis' means 8 hours
a day, for 5 days a week, or an equivalent work schedule."  SSR
96-8p, 1996 WL 374184, at *1 (July 2, 1996).

number of job opportunities available to her prior to October 4, 2009.[3]  Admin. R. 14-15; see 20 C.F.R. §§ 404.1520(a)(4)(iv),(v); pt. 404, subpt. P, App. 2, § 202 (the "Grid").  Lonardo contends that the ALJ erred because she:

> (1) improperly concluded that despite Lonardo's depression and anxiety, she was capable of performing unskilled work, Admin. R. 12-14; Cl. Br. 2-6,
>
> (2) improperly evaluated Lonardo's subjective complaints, rendering her RFC determination flawed, see Admin. R. 13; Cl. Br. 12-15; see generally SSR 96-7p, 1996 WL 374186 (July 2, 1996),
>
> (3) improperly assigned greater weight to the opinions of non-examining physicians, and did not grant controlling weight to her treating physician's functional capacity assessment, Admin. R. 13-14, Cl. Br. 6-12, see generally 20 C.F.R. §§ 404.1502, 404.1527(d); SSR 96-2p, 1996 WL 374188 (July 2, 1996), and,
>
> (4) failed to obtain vocational expert testimony to determine the availability of work opportunities and instead improperly relied on "the Grid" despite Lonardo's non-exertional limitations.  Admin. R. 14-15, Cl. Br. 17-20, see generally Ortiz. v. Sec'y of Health & Human Servs., 890 F.2d 520, 525-26 (1st Cir. 1989).

The Commissioner asserts that the ALJ's findings are supported by substantial evidence in the record, and moves for an order

---

[3]The ALJ approved Lonardo's claim for Supplemental Security Income benefits as of the date of her 50th birthday.  The ALJ also determined that Lonardo was disabled on that date under Medical-Vocational Rule 201.14, see generally 20 C.F.R. pt. 404, subpt. P, App. 2, § 200, but since she was last insured for disability benefits as of September 30, 2007, her claim for disability benefits was denied.  Admin. R. 15.

affirming his decision.[4]  This court has subject-matter
jurisdiction under 28 U.S.C. § 1331 (federal question) and 42
U.S.C. § 405(g) (Social Security).  After a review of the
administrative record, the court concludes that the ALJ
improperly relied on "the Grid" to determine whether there were
jobs available to her in the national economy.  See generally 20
C.F.R. pt. 404, subpt. P, App. 2, § 200(e).  The court therefore
grants Lonardo's motion and denies the Commissioner's motion.

I.   **APPLICABLE LEGAL STANDARD**

The court's review under Section 405(g) is "limited to
determining whether the ALJ deployed the proper legal standards
and found facts upon the proper quantum of evidence."  Nguyen v.
Chater, 172 F.3d 31, 35 (1st Cir. 1999); see Simmons v. Astrue,
736 F. Supp. 2d 391, 399 (D.N.H. 2010).  If the ALJ's factual
findings are supported by substantial evidence in the record,
they are conclusive, even if the Court does not agree with the
ALJ's decision and other evidence supports a contrary conclusion.
See Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535
(1st Cir. 1988).  Substantial evidence is "such relevant evidence
as a reasonable mind might accept as adequate to support a

---

[4]The Decision Review Board, see generally 20 C.F.R.
§ 405.401, affirmed the decision of the ALJ, Admin. R. 1,
rendering it a final decision of the Commissioner that is
appealable to this court.  See 20 C.F.R. § 405.415.

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)
(quotations omitted). The ALJ is responsible for determining
issues of credibility, resolving conflicting evidence, and
drawing inferences from the evidence in the record. See
Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222
(1st Cir. 1981); Pires v. Astrue, 553 F. Supp. 2d 15, 21 (D.
Mass. 2008) ("resolution of conflicts in the evidence or
questions of credibility is outside the court's purview, and thus
where the record supports more than one outcome, the ALJ's view
prevails"). The ALJ's findings are not conclusive, however, if
they were "derived by ignoring evidence, misapplying the law, or
judging matters entrusted to experts." Nguyen, 172 F.3d at 35.
If the ALJ made a legal or factual error, the decision may be
reversed and remanded to consider new, material evidence, or to
apply the correct legal standard. Manso-Pizarro v. Sec'y of
Health & Human Servs., 76 F.3d 15, 16, 19 (1st Cir. 1996); see 42
U.S.C. § 405(g).


II. **BACKGROUND**

The parties filed a Joint Statement of Material Facts
(document no. 11), which is part of the record reviewed by the
court. See LR 9.1(d). This court will briefly recount the key

4

facts, and otherwise incorporates the parties' joint statement by
reference.

Lonardo filed an application for Disability Insurance
Benefits in December 2006 claiming she became disabled in January
2004 due to anxiety and depression, arthritis, fibromyalgia, and
multiple sclerosis.  See Admin. R. 25, 97-101, 118-40, 144-69.
Lonardo reported that for a number of years she has been limited
by debilitating pain and numbness that makes it difficult to
walk, sit, and stand.  See id. at 33-34, 38-39.  Lonardo stated
that she has episodes where her body becomes numb and she cannot
move.  She claimed to have overwhelming fatigue that "can come on
at any given time. . . . I can experience it for days or weeks,
and even months."  Id. at 37.  Lonardo also reported severe
depression caused by her physical ailments and debilitating
anxiety that is only partially controlled by medication.  See id.
at 38-39.

Lonardo testified that before she allegedly became disabled,
she "was cleaning three to four homes a day, five days a week . .
. ."  Id. at 34.  By January 2010, however, she had only four
clients and, at least once a month, she is forced to reschedule a
cleaning appointment because she is physically and emotionally

unable to work.[5]  Id. at 37.  Lonardo's daughter testified at the
hearing that she witnessed episodes where Lonardo would go
completely numb and was unable to function.  She also testified
that Lonardo's ability to clean homes slowed dramatically and
that she often needed to reschedule cleaning appointments because
she was in too much pain to work.  Id. at 46-48.

     Lonardo's application for benefits was denied in July 2007,
see id. at 61-64, because it was determined that although she
suffered from multiple sclerosis, fibromyalgia, "as well as
mental health issues," she was still capable of performing her
prior work as a housekeeper.  Id. at 64.  Lonardo appealed that
decision to the ALJ, see generally 20 C.F.R. § 405.301, who,
after a hearing in January 2010, concluded that although Lonardo
was incapable of returning to her prior work, she retained the
residual functional capacity to perform a full range of sedentary
unskilled work and was not entitled to disability benefits.
Admin. R. 12-16; see generally 20 C.F.R. §§ 404.1520(a)(4)(iv),
(v).

     The ALJ's RFC analysis and choice to rely on the Grid
necessarily required consideration of evidence regarding the
limiting effects of Lonardo's fatigue, anxiety, and depression in

_____

     [5]Lonardo stated that her income from cleaning varied from
$100 to $500 per month.  Id. at 27.

6

addition to her complaints of overwhelming pain.  See generally, Guyton v. Apfel, 20 F. Supp. 2d 156, 163 (D. Mass. 1998) (permissible for ALJ to rely on the grid where nonexertional impairments "impose no significant restriction on the range of work" a claimant can perform (quotations omitted)).  Evidence of Lonardo's non-exertional impairments therefore will be summarized at the outset.

Records indicate that Lonardo had been treated for a number of ailments at the Strafford Family Practice from November 2002 through September 2006.  Admin. R. 187-97.  Although Lonardo asserts an onset date of January 2004, early treatment records from the Strafford Family Practice reveal complaints of fatigue and depression as early as November/December 2002.  Id. at 194-95.  In 2005, however, she reported that her depression "had improved."  Id. at 189.  Treatment records from the Newburyport Family Practice from May 2004 through April 2007 indicate that Lonardo continued to receive treatment for anxiety, depression, and fatigue.  Id. at 210-40, 288-89, 329-33.  Lonardo also was treated by a licensed social worker, Jane Zeller, between January 2004 and March 2007 for depression and anxiety.  Id. at 326-27. Zeller observed that Lonardo demonstrates a "quite depressed" mood and "a good deal" of anxiety.  Id. at 326.  Although Zeller observed that Lonardo showed no thought disorder, Zeller opined

that her memory was impaired and she had difficulty
concentrating.  Id.  Zeller also stated that Lonardo was socially
isolated and she became anxious very easily, so much so that she
became "impaired cognitively" when under stress.  Id. at 327.

    Lonardo's mental capabilities were evaluated three
additional times after she filed for disability benefits.  In
February 2007, treating physician Dr. Renae Freid at Newburyport
Family Practice completed a mental impairment questionnaire.  Id.
at 288-89.  Dr. Freid opined that Lonardo suffered from
generalized anxiety and depression, and posttraumatic stress
disorder.  Id. at 289.  Dr. Freid noted that Lonardo responded
only marginally to medication.  Dr. Freid stated that she had
"limited sustainability" in task performance due to physical pain
and because she is easily distracted and overwhelmed.  Id.

    Lonardo also had a consultative exam by Dr. Sandra K.
Vallery, Ph.D., in June 2007.  Id. at 334-39.  Dr. Vallery's
assessment revealed mixed functionality.  Dr. Vallery observed
that Lonardo had good insight and judgment, was able to
understand directions, and interact and communicate effectively.
Lonardo also exhibited sustained concentration.  Id. at 337-38.
Dr. Vallery noted, however, that Lonardo's memory was impaired
and that she "is not able to tolerate stresses common to the work
environment, such as interactions with superiors, decision making

8

and scheduling." <u>Id.</u> at 338.  Dr. Vallery also stated that
Lonardo "is rather overwhelmed . . . .[and] concerns are
manifested in her anxiety as well as her depression, which takes
on several vegetative symptoms and impairs her functioning."  <u>Id.</u>
Dr. Vallery observed that "[i]n any event, Ms. Lonardo is
vulnerable to her symptoms of anxiety and depression."  <u>Id.</u>

     A few weeks after Dr. Vallery's assessment, an SSA
consultant, Dr. Michael Schneider, Psy.D., completed a
psychiatric review and mental residual functional capacity
assessment.  <u>Id.</u> at 340-57.  Dr. Schneider concluded that Lonardo
suffered from affective disorders and anxiety disorders with
recurrent severe panic attacks occurring on the average of at
least once per week.  <u>Id.</u> 340, 345.  Dr. Schneider also found
that Lonardo had moderate restrictions in daily living, social
functioning, and maintaining concentration, persistence and pace.
<u>Id.</u> at 350.  Dr. Schneider opined that Lonardo would be
moderately limited in understanding, remembering, and carrying
out detailed instructions, responding appropriately to criticism,
and adjusting to changes in a work setting.  <u>Id.</u> at 354-55.  He
concluded, however, that Lonardo could work a normal workweek
because she is capable of understanding and remembering short
simple instructions and that if her supervisors were not overly

critical, she could interact appropriately in a work setting and adjust to changes.  Id. at 356.

Dr. Schneider did not find Lonardo's allegations of mental impairment credible.  He stated that "[i]t would appear, that most of her limitations are more related to physical problems, and not her mental limitations."  Id. at 356.  Dr. Schneider also specifically disagreed with Dr. Vallery's assessment of Lonardo's functional abilities.  Dr. Schneider opined that the

> functional opinions of Dr. Vallery are not given as much weight as usual, particularly her statement about not being able to tolerate stresses common to the work environment.  . . . This is not supported by the objective data of her own evaluation, nor is it supported by the ADLs filled out by the claimant.  For example, this claimant indicates that she has no difficulty getting along with others, especially authority figures.  She did not have difficulty with Dr. Vallery and Dr. Vallery did indicate that she is able to interact and communicate effectively.  Also, the claimant is able to maintain some schedule, continuing to clean 3 houses that she has cleaned in the past.[6]

Id.

---

[6]The court is a bit baffled by this latter observation as the record indicated that Lonardo cleaned these three houses at most only weekly, and then reportedly only when she was feeling well.  The court is unsure how Dr. Vallery's observation of Lonardo's inability to maintain a schedule is inconsistent with Lonardo's disability function reports.

The ALJ determined that Lonardo was severely impaired due to cervical radiculopathy, depression and anxiety.[7]  Admin. R. 11, see generally 20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ specifically found, however, that Lonardo's reports about the limiting nature of her impairments were not credible.  The ALJ did conclude that Lonardo's reported fatigue "would limit her" ability to perform, and thus she was only capable of performing sedentary unskilled work.[8]  Admin. R. 13; see generally, 20 C.F.R. § 404.1520(a)(4)(iv).  The ALJ concluded that given this RFC, Lonardo was unable to perform her past work as "house cleaner."  Admin. R. 14.  The ALJ, relying on the Grid, concluded, however, that there were a significant number of jobs available in the national economy and Lonardo was therefore not

---

[7]The ALJ also stated that although the record showed that Lonardo experienced irritable bowel syndrome, an aneurism, hip pain, and sinusitis, these impairments were not severe.  As discussed infra Part III, the ALJ did not address Lonardo's fibromyalgia.  Admin. R. 11.

[8]Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."  20 C.F.R. § 404.1567(a).

Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).

disabled.  Id. at 14-15; see generally, 20 C.F.R. §§ 404.1520(a)(4)(iv),(v).

## III. **ANALYSIS**

A five-step process is used to evaluate an application for social security benefits.  20 C.F.R. § 404.1520(a)(4).  The applicant bears the burden through the first four steps to show that she is disabled.[9] Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the Commissioner bears the burden of showing that a claimant has the residual functional capacity to perform other work that may exist in the national economy.  Id.; see also 20 C.F.R. § 404.1520(a)(4)(v); Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991).  The ALJ's conclusions at steps four and five are informed by her assessment of a claimant's RFC, which is a description of the kind of work that the claimant is able to perform despite her impairments.  20 C.F.R. §§ 404.1520(a)(4), 404.1545.

---

[9]Specifically, the claimant must show that: (1) she is not engaged in substantial gainful activity; (2) she has a severe impairment; (3) the impairment meets or equals a specific impairment listed in the Social Security regulations; or (4) the impairment prevents or prevented her from performing past relevant work.  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.A. § 423(d)(1)(A).

Lonardo contends that ALJ erred in failing to obtain vocational expert testimony at Step 5.  Lonardo asserts that the ALJ impermissibly relied on the Grid to determine that there was work available to her in the national economy despite the nonexertional limitations presented by symptoms of fatigue, depression and anxiety.  Cl. Br. 17.  The court agrees.

Although a claimant bears the burden of showing she is disabled in the first four steps of the evaluation process, "the burden shifts to the Secretary to show the existence of other jobs in the national economy that the claimant can nonetheless perform." Guyton, 20 F. Supp. 2d at 162 (quotations omitted). Where the claimant's limitations are exclusively exertional, the Commissioner can satisfy his burden through the use of the "Grid," a regulatory "matrix of the applicant's exertional capacity, age, education, and work experience.  If the facts of the applicant's situation fit within the Grid's categories, the Grid directs a conclusion as to whether the individual is or is not disabled." Seavy v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (quotations omitted); see generally, 20 C.F.R. pt. 404, subpt. P, App. 2, § 200.  The Grid thus provides the Commissioner with a streamlined method to determine eligibility where a claimant's limitations are purely exertional.  See, e.g., Ortiz, 890 F.2d at 524.

"Yet the Grid is predicated on [the claimant] having an impairment which manifests itself by limitations in meeting the *strength* requirements of jobs.  Accordingly, where a claimant has one or more non-strength limitations, the [Grid does] not accurately reflect what jobs would or would not be available." Id. (Quotations, citations, and ellipses omitted.)  Therefore, "if the [claimant] has nonexertional limitations (such as mental, sensory, or skin impairments . . .) that restrict [her] ability to perform jobs [she] would otherwise be capable of performing, then the Grid is only a framework to guide the decision." Seavy, 276 F.3d at 5 (quotations and brackets omitted).  In such cases, "the Secretary must carry his burden of proving the availability of jobs in the national economy by other means, typically through the use of a vocational expert." Ortiz, 890 F.2d at 524 (citations and quotations omitted).  Indeed, where nonexertional impairments are present, vocational testimony "is usually required to determine the appropriate occupational base" Devin v. U.S. Soc. Sec. Admin., No. 08-cv-242-PB, 2009 WL 1616665, at * 3 (D.N.H. June 4, 2009), as "the nonexertional impairment may significantly affect [a] claimant's ability to perform the full range of jobs at her strength level, and because the SSA bears the burden of proving jobs are available . . . ." Id.

The rules do not absolutely prohibit an ALJ from consulting the Grid where there are some nonexertional limitations.  Rather, in certain cases

> [i]t is permissible for the Administrative Law Judge to rely on the Grid where she concludes that these nonexertional impairments or limitations impose no significant restriction on the range of work a claimant is exertionally able to perform.  Moreover, if a non-strength impairment, even though considered significant, has the effect only of reducing that occupational base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability.  Yet the more that occupational base is reduced by a nonexertional impairment, the less applicable are the factual predicates underlying the Grid rules, and the greater is the need for vocational evidence.

Guyton, 20 F. Supp. 2d at 163 (quotations and citations omitted). So long as the record "amply support[s]" the conclusion that the claimant's nonexertional limitations do not interfere with a full range of work, reliance on the Grid is appropriate.  Ortiz, 890 F.2d at 526.  Courts caution, however, that "an ALJ typically should err on the side of taking vocational evidence when [a nonexertional] limitation is present . . . . [S]hould an ALJ determine that the Grid can be relied on in such a case, we urge that the evidentiary support for that decision be enumerated . . . clearly and in great[] detail . . . ."  Id. at 528; see Larocque v. Barnhart, 468 F. Supp. 2d 283, 289 (D.N.H. 2006).

In this case, the ALJ relied on the Grid because she concluded that Lonardo's depression, anxiety, and fatigue did not

15

impair her ability to complete a full range of sedentary
unskilled work.  Admin. R. 14-15.  The First Circuit has stated
that "so long as a nonexertional impairment is justifiably found
to be substantially consistent with the performance of the full
range of unskilled work, the Grid retains its relevance and the
need for vocational testimony is obviated." Ortiz, 890 F.2d at
526.  Where a claimant has mental impairments, the ALJ must
carefully determine: "(1) whether a claimant can perform close to
the full range of unskilled work, and (2) whether [she] can
conform to the demands of a work setting, regardless of the skill
level involved." Id.  An inability to satisfy either inquiry
precludes reliance on the Grid. Cf. id.

        The ALJ's decision to rely on the Grid does not contain an
in depth analysis of either step outlined above.  Instead the ALJ
simply concludes that "the additional limitations had little or
no effect on the occupational base of unskilled sedentary work."
Id. at 15.  Implicit in the ALJ's use of the Grid is the
determination that Lonardo can perform a full range of work and
adjust to the demands of the workplace. Cf. id. at 526-27.  The
court questions whether the record supports a finding that
Lonardo can perform close to the full range of unskilled work.

        The basic mental demands of competitive remunerative
        unskilled work include the abilities (on a sustained
        basis) to understand, carry out, and remember simple
        instructions; to respond appropriately to supervision,

coworkers, and usual work situations; and to deal with
changes in a routine work setting.  A substantial loss
of ability to meet any of these basic work-related
activities would severely limit the potential
occupational base.

Id. at 526 (quotations omitted).  Most medical professionals who

evaluated Lonardo questioned her ability to function in a normal

unskilled work setting.  Dr. Freid noted that Lonardo was

"[e]asily overwhelmed" by stress," was distracted easily and had

trouble completing tasks.[10]  Id.  Similarly, Dr. Vallery observed

"Ms. Lonardo is not able to tolerate stresses common to the work

environment, such as interactions with supervisors, decision

making and scheduling."  Admin. R. 338.  Although SSA

consultative psychologist Dr. Michael Schneider opined that

Lonardo could "complete a normal work week," he limited her

ability to "interact appropriately" with peers and supervisors to

"an environment where the supervisory criticism is not overly

critical of her performance."  Id. at 356.  Dr. Schneider also

concluded that Lonardo experienced "recurrent severe panic

attacks", had moderate limitations in maintaining concentration,

persistence and pace, carrying out instructions, responding to

criticism, and adjusting to changes at work.  Id. at 340, 345.

---

[10]Dr. Freid also noted that Lonardo exhibited a limited
ability to perform and complete tasks due to physical pain.
Admin. R. 289.

Given the amount of record evidence indicating that
Lonardo's mental restrictions impaired her ability to function in
an unskilled work setting, the court is hesitant to conclude that
the ALJ appropriately relied on the Grid.  This is particularly
true here where the ALJ's order contained little mention or
analysis of the effect of Lonardo's nonexertional impairments on
the occupational base.  Cf. Guyton, 20 F. Supp. 2d at 164.  The
ALJ should have consulted a vocational expert given these
limitations, or at least addressed them in her discussion of the
Grid.  See Ortiz, 890 F.2d at 526-27 (capacity to do unskilled
work requires careful consideration of claimant's functionality).

Reliance on the Grid also was inappropriate here because the
ALJ's implicit finding that Lonardo could conform to the regular
demands of a workday was unsupported by the evidence.  Performing
in a regular workplace involves "a claimant's ability to
accommodate the demands of a work setting per se. . . . [T]he
mentally impaired may cease to function effectively when facing
such demands as getting to work regularly and remain in the
workplace for a full day."  Id. at 527 (quotations and ellipses
omitted).

The record is far from clear regarding Lonardo's ability to
maintain a regular working schedule.  Beginning in 2002,
Lonardo's income from cleaning dropped dramatically.  Lonardo and

18

her daughter testified that although Lonardo maintained a few
clients, she rescheduled cleaning appointments on a regular
basis.  The ALJ did note that Lonardo "has remained active
working part-time as a housekeeper."  Admin. R. 13.  This
observation overstates the record, as Lonardo's part-time work
was extremely limited and erratic.  At the very least then, the
ALJ should have conducted a more searching discussion and
analysis of the effect of Lonardo's non-exertional impairments on
the available occupational base.  See, e.g. Ortiz, 890 F.2d at
528.  Indeed, it is error to rely on the Grid where record shows
that a claimant "needs a flexible, self-paced job with an
understanding boss."  Devin, 2009 WL 1616665, at * 5.  The
applicable regulations require vocational expert evidence in
those cases "because the tables do not reflect an occupational
base that is circumscribed by her individual restrictions."  Id.

In sum, the ALJ's decision is reversed because she "ignored
important limitations" in Lonardo's ability to work[11] and did not

---

[11]Additionally, the court is concerned with the ALJ's
treatment (or lack thereof) of the Lonardo's fibromyalgia claim.
See Cl. Br. 8-12.  Although Lonardo asserted that she suffered
from fibromyalgia, see, e.g., Admin. R. 25, 38, 123, 168, and her
records reveal numerous complaints of musculoskeletal pain, see
e.g. id. at 276, 281, 291, the ALJ's order completely ignores any
claim or evidence of fibromyalgia.  Id. at 11.  Apart from the
ailments she found severe, the ALJ noted only that "the claimant
has also received general medical care for various complaints,"
then dismissed sinusitis, a possible aneurysm, and hip pain as
non-severe.  Admin. R. 11.  The ALJ ignored Lonardo's

fibromyalgia claim, despite the fact that fibromyalgia was
asserted in Lonardo's disability claims, id. at 123, mentioned in
the SSA denial letters, id. at 56, 64, listed as a "secondary
diagnosis" on SSA consulting physician Dr. Jaffe's 2007 RFC
assessment, id. at 358, is mentioned multiple times in Dr.
Vallery's assessment, id. at 334-339, and was discussed at the
hearing.  Id. at 25, 38.  Although the ALJ gave little weight to
an evaluation by Dr. Sanchez in 2009 where fibromyalgia was
assessed at length, id. at 13-14, 396-99, the disorder was
mentioned by other health professionals well before Dr. Sanchez's
report was generated.  Id. at 25, 38, 243, 358.  Although the ALJ
is not required to elaborate on every shred of evidence before
her, see Rodriguez v. Sec'y of Health & Human Servs., No. 90-
1039, 1990 WL 152336, at *1 (1st Cir. 1990), it is improper to
fail to acknowledge, let alone analyze, a significant claim of
impairment arguably supported by evidence in the record and
brought to the attention of the ALJ.  See Torres v. Barnhart, 235
F. Supp. 2d 33, 41 (D. Mass. 2002) (error to ignore cognitive
impairment where record contains examples of impairment); cf.
Rodriguez, 1990 WL 152336, at *1 (evaluation proper where there
were no "significant omissions").  This is not the case where an
ALJ properly considers a limitation and, based on the record,
discounted that limitation's effect on the claimant's functional
capabilities.  Cf. Sheffield v. Callahan, 9 F. Supp. 2d 75, 81
(D. Mass. 1998).  It simply appears that either by omission or
commission, a significant claimed impairment was ignored.

     The court's concern is heightened by recent circuit
precedent involving fibromyalgia.  The Court of Appeals, in
Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009), stated that
it was error in a fibromyalgia case for an ALJ to reject a
treating provider's assessment of disability based on the lack of
objective evidence to support it.  The court concluded that
because "[t]he primary symptom of fibromyalgia, of course, is
chronic widespread pain, and the Commissioner points to no
instances in which any of claimant's physicians ever discredited
[her] complaints of such pain," the ALJ's decision to discredit
the claimant's reports of pain was unsupported by the evidence.
Id. at 414.  To be sure, the analysis of a fibromyalgia claim is
complex.  But where there are years of medical reports
documenting complaints of physical pain, Lonardo's alleged
fibromyalgia claim should not be ignored by the ALJ.  Here, the
ALJ never acknowledged Lonardo's claim in her order.  The ALJ did
find that Lonardo was severely impaired by cervical

adequately explain why, given Lonardo's limitations, an
individualized assessment was not needed here.  Larocque, 468 F.
Supp. 2d at 289-90.  As such, the decision of the ALJ is
reversed, cf. Guyton, 20 F. Supp. 2d at 163 (failure of ALJ to
adequately discuss effect of mental impairment on occupational
base "is a sufficient basis for remand"), and remanded for
further proceedings.


IV.   **CONCLUSION**

      Pursuant to sentence four of 42 U.S.C. § 405(g), Lonardo's
motion to reverse and remand the Commissioner's decision[12] is
granted.  The Commissioner's motion to affirm the decision[13] is
denied.  The Clerk of Court is directed to enter judgment in
accordance with this order and close the case.

---

radiculopathy.  Admin. R. 11.  It is unclear, however, if the ALJ
considered this impairment as the sole cause of Lonardo's pain
and therefore her fibromyalgia claim need not be mentioned.  It
is advisable on remand that this facet of Lonardo's claim be
addressed.

      [12]Document no. 7.

      [13]Document no. 10.

21

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:   November 16, 2011

cc:   Raymond J. Kelly, Esq.
      T. David Plourde, Esq.